Please be seated. Would the clerk call the next case please? 312-518 Justin Edwards, appellant by Scott Pyles v. James and Colleen Lombardi, appellee by Brian. Thank you. Mr. Pyles, good morning. Good morning. May it please the court, this case involves an appeal from a grant of summary judgment on behalf of the defendants in an negligence case. I don't think this is a very complicated case. It's essentially a case where a boy, I shouldn't say a boy, he was about 23 years old at the time, but a former employee of the defendants was asked by his former employer, Mr. Lombardi, to care for some animals that they had at their home while they were going to be on vacation. Among these animals that he was to help feed, clean the stalls, essentially keep the status quo, was a llama. This llama's name was Bo. Mr. Edwards, the plaintiff in this case, had on four to six prior occasions had been at the defendants' home to take care of, essentially clean the stalls and feed them and so forth. On one of the prior occasions with the defendant, Mr. Lombardi, present, the llama had reared his head up and had hit Mr. Edwards, causing a bloody nose and a bloody lip. There was also some occasions where the llama had spit at the plaintiff. These were talked about and discussed in the record in the depositions. Back in 2008, on one of the occasions that Mr. Edwards was taking care of the animals for Mr. Lombardi, and Mr. Edwards was getting some money for doing this for Mr. Lombardi, when he went to go clean the stalls, the llama approached him and charged him and engaged Mr. Edwards. Mr. Edwards tried to get out of the barn, tried to get over a wall into a stall, and the llama got to Mr. Edwards and head-butted him into a wall, causing him some injury. Mr. Edwards was eventually able to escape, he grabbed a rake and held the llama off. In your brief, you argue that this wasn't an assumption of risk, because you argue that there was nothing in the record to indicate that the plaintiff appreciated or even knew that the llama would do something like this. You say that in your brief. I do. But aren't the facts a little different? I mean, wasn't it testimony that the llama was in the barn, it wasn't empty at the beginning, and that the person had cared for the llama before? Mr. Edwards had cared for these animals before, and the llama was among the animals. The reason I say, and I cite to the Fox case and the Stone v. Guthrie case to a certain extent, is that whether or not Mr. Edwards truly appreciated the fact that even though there might have been some minor issues, and I would say minor, I think if a person gets too close to the animal and it rears up its head unexpectedly and hits him, I think that's different from the llama charging him. Well, wasn't there testimony that the plaintiff testified that the llama would approach him and pretty much charge him a little bit? Well, there's some deposition testimony that indicated that the llama did approach on prior occasions. And it pushed him while he was cleaning the barn? Well, again, I think we're taking a look at deposition testimony, and there's a lot of different, I guess if the llama had walked up to him and nudged him or had put his head into it, or whatever the interpretation of that testimony is, I think is a little bit different from the incident that took place here, where the llama charged him, and then after Mr. Edwards attempted to get away, the llama continued to come after him, and then even after he tried to get away, he head-butted him over a wall. There isn't anything in Mr. Edwards' experience with this llama that would reach that level or that level of risk that I think that took place on that given day. I think there has to be a distinction there. Well, let me, if I could, let me rephrase the question and add in, look at the evidence. What did the defendant know about this animal that the plaintiff didn't know? Well, as I point out in my reply brief, and I read the argument of the defendant, you know, the defendant is a pet store owner. He obviously has lots of different types of animals. He had miniature horses, llamas, he had some other animals. He obviously purchased the llama from, I believe, a breeder. Her name was Ms. Snow. To compare the knowledge that Mr. Edwards had, who had been there on four to six occasions, I believe is what the deposition testimony is, to Mr. Lombardi, who had had the llama for seven years, cared for him for months, and we're not talking about an instance where Mr. Edwards, the plaintiff, was there on four or six occasions cleaning up stalls. Mr. Lombardi did this all the time. And in the testimony, at least in the deposition, Mr. Lombardi indicated that he knew that the llamas were aggressive and that the llamas had spit at him and had charged people. So is there, would I say there's an equal knowledge there? I would say no. I would say that Mr. Lombardi obviously has got to have the greater knowledge. He had more contact with the animal than Mr. Edwards did. But the plaintiff knew this animal was ornery. I will concede that the plaintiff had some limited knowledge based on his limited contact with the animal that indicated there was one time that he did rear up his head and hit him in the head. Now, whether we got too close or whether or not he did something, and the record's not completely clear on that, but there was an instance where he did suffer a bloody lip and a bloody nose. Mr. Edwards worked for Mr. Lombardi for a while. That's correct. During the time that he worked for him, was the llama there? I don't think he was at the pet store. The llama was at, I think Mr. Lombardi had, I don't know if you'd call it a farm, but he had an area on his residence where he went and had these animals. And Mr. Edwards worked for Mr. Lombardi at his pet store, and the pet store was at a different location. But having said that, Mr. Edwards did work for those four to six occasions, did work for Mr. Lombardi in cleaning the stalls at the farm where Mr. Lombardi kept the animals. Okay, and then it was my understanding, correct me if I'm wrong, that Mr. Edwards asked Mr. Lombardi if the llama could be kept out of the area where he would be working? That's correct. In fact, Why did he ask? I had, prior to him working to him on an occasion where the injury, or the time period in which Mr. Edwards worked from when he was injured, he did ask the defendant, can you keep the llama locked up in a stall? And why did he do that? Well, probably because of the prior incidents where he had gotten hit, where the llama had unexpectedly reared up and hit him in the face. And the fact that the animal did have some aggressive tendencies. I think that's a matter of degrees, and frankly... Well, all he's got to know is the animal's aggressive. He didn't have to know exactly he's going to get booted over a fence as opposed to, you know, the exact mechanism of the injury. All he got to know is this animal is aggressive and poses some danger to him. Needless to say, he had to know the exact type of injury he would receive or the exact manner in which the animal would attack him. Which seemed to make the owner of that animal an insurer of the safety of anybody that got near him. I don't think that's the law, is it? No, I'm not suggesting that. But as it says in the Fox and the Stone case that I cite, you know, the question of whether or not the plaintiff appreciated what happened, maybe the degrees, well, he knew it was aggressive, but did he know this would happen? Those are typically questions reserved for the jury, not as a matter of law for the trial court. And that's the main thrust of what I'm trying to say here. The case law is pretty clear. And in reviewing my brief in preparation for the argument today, I think sometimes I don't, in arguing the summary judgment cases that I have done in the past, and it's unfortunate to look at my brief and see that I've done four or five of these already in front of the court and that they're using my cites in the brief. But in this particular case, I think it's important to emphasize that when we're looking at the evidence in this case, the jury is a fact finder. Having the witnesses on the stand, having the jury observe them as they testify about what their experiences are, what their knowledge of what they thought the animal could or couldn't do, how much they knew or didn't know, and having the jury observe and put all this evidence together as opposed to reviewing deposition transcripts, I think is a key component here. That is the fact finder. And the inferences that have been taken from the facts that are drawn from the evidence that gives the jury the providence in making the decision of whether or not the plaintiff really appreciated whether or not this animal could do what would injure him. Did he understand what the problems were? Did he know that the... appreciate the fact that, well, it's much more than just bringing his head up when you chase him throughout the barn, knock him into a wall, kick him over a stall door. Well, didn't he obviously answer that? No, he didn't, because if he did, he wouldn't have gone into the... we wouldn't be here today because he wouldn't have gone into the stall. I would probably say yes to that. But... But it seems to me that your argument also seems like, well, thank you. We all went through discovery, right? And... was there any evidence, for example, that the owner had seen this animal do the same thing he did to your client, just him or anyone, somebody else? There was nothing in the deposition transfer from the record that I could see that the animal had ever gone to the extent that it had with Mr. Edwards, where, you know, the animal had chased somebody and had done at least, you know, the sustained attack, as I guess I refer to it, what I consider a sustained attack that the llama had. However, Mr. Lombardi did testify that he had seen the llama engaging with other animals. So he did know that the llama was aggressive and there were other incidents with other animals that he had witnessed. So, again, the level, the appreciation of the risk and the knowledge, I think, again, are not questions for the trial court. They are questions for the jury after they've had an opportunity and then they await all the witnesses in testifying. Especially in a case like this, where you've got a situation where somebody... I think I can fairly characterize this. I think that Mr. Edwards was doing Mr. Lombardi a favor. Come over and take care of my animals while I'm on vacation. I'll give you some money for it. Just clean out the stalls. Make sure that there's nothing going on. And essentially, Mr. Edwards agreed to do that. He used to work for Mr. Lombardi at the pet store. I think he was kind of doing him a favor. Thank you. So in terms of what he didn't appreciate and what Mr. Lombardi knew, I would say in this particular case, I'm sure that Mr. Lombardi knew in general that the llama was going to be aggressive. This whole thing could have been avoided, frankly, if Mr. Lombardi had just locked up the llama in the stall like Mr. Edwards had wanted to. He wouldn't be standing here. There wouldn't have been anything. The llama would have been safely put away. That's the negligence. The question is, did Mr. Edwards appreciate or assume the risk as a trial court, or as a matter of law, based on what was in the deposition transcripts, did he assume as a matter of law the risk of going in when he went in to clean the barn? Now, I also... Let me ask you, even if you'd locked him in the stall, you're going to leave that animal in an unclean stall forever? Somebody's got to go in and clean the stall, don't they? Well, I suppose that's true, and I don't know... I guess I wouldn't know what the arrangement or how they would do that. I don't know if they would bring in extra people, or I don't know, maybe there was a special leash. Those things are not talked about in the deposition transcript. Frankly, I think that would probably be talked about maybe more in a trial, you know, if we got extensively into about what could or couldn't have been done. He even said that even if Mr. Edwards assumed the risk, okay, in trying to do the favor for Mr. Lombardi, I think the deliberate encounter exception applies here as well. And I make that point as well. That wasn't argued in the trial, was it? I don't know if the words deliberate encounter were specifically used, although I would state that the theme was argued to the trial court. Arguably, that was weighed by not referencing the doctrine. I think that... But like I said, I think the doctrine was talked about, but I don't think that the words deliberate encounter were used, but the theme of the deliberate doctrine encounter was referred to and talked about at the trial court level. The defendant wants to have it both ways here. They want to say, well, Mr. Lombardi didn't know anything, therefore he didn't have a duty. But on the other hand, Mr. Edwards seemed to know enough to be able to assume the risk. Really can't have it both ways. And frankly, because of the arguments made by the defendants, I think that that argument and those issues conflict. And I think that these are matters that should essentially be sorted out by a jury of Mr. Edwards and Mr. Lombardi's peers in Burnett County, not decided as a matter of law by the trial court. Did he get the chihuahua? I'm sorry? Did he get the chihuahua? Did he get the chihuahua? That's what he was working for was a chihuahua, as I understand it. You know what? If that was talked about, I missed that. Okay. If there's no other questions, I shall reserve the balance of my time. No, I was curious about the doctrine. Okay. Mr. Hunt, good morning. Brian Hunt, I'm James McAuley Lombardi. I may please the court and counsel. Let me start off with the last question. I don't know whether he got the chihuahua either. Okay. Respectfully, though, what I think is true here is that it's the plaintiff who's trying to have his cake and eat it, too, and trying to have it both ways. What would need to be established, we did assert multiple grounds as a basis for summary judgment to be entered in this case. Judge Peterson happened to seize on the assumption of risk. We did assert at the trial court, and by the way, you all know that you can affirm the summary judgment on the same basis Judge Peterson found or any other basis that you think that the judgment was appropriate. But we did assert that the Lombardis did not have knowledge of dangerous propensities such as were exhibited here, which is necessary by the case law to impose negligence for the conduct of an animal, and that that could be a basis for summary judgment. But the argument that we put greater emphasis on and which Judge Peterson abided by was that, in fact, the plaintiff had assumed the risk involved here because the only testimony regarding any dangerous propensity of Bo came from the plaintiff himself. And, in fact, there was a question about the discovery that was done. There had been disclosed by the plaintiff three or four witnesses who were purportedly going to testify about the dangerous propensities of Bo. In fact, they were all deposed or otherwise obtained statements from, and none of them corroborated that there was any knowledge of the dangerous propensities aside from that which Mr. Edwards put forth. And so, you know, what we have then is the plaintiff has to establish, the plaintiff who has the burden of proof, of course, has to establish that the defendants had knowledge of these dangerous propensities, and the only knowledge that came forth from any of the discovery that was done was that which Mr. Edwards said that he had. Now, the problem is that that runs smack into case law that directly addresses this topic of the problem for the plaintiff. And they did rely on FOX in the appellate brief. But FOX is not a case that deals with an animal at all. FOX involves assumption of the risk in the context of the defective condition of a plow. The cases that we relied upon, which we cited to the trial court and cited again here, all do involve the conduct of an animal and all do involve assumption of the risk. And two of them squarely involved a grant of summary judgment in favor of the defendants, which are Vander Lee and Clark. But also Ennin, which we cited in our brief, goes to the point that I was just making, which is, and I'm paraphrasing them, so the plaintiff, in this instance it was a woman who had been riding a horse, the plaintiff cannot explain why she should not be charged with the same crime. And that was used as a reason to support the summary judgment, I'm sorry, the judgment that was entered in favor of the defendants in that case. The suggestion that the defendants had to have had greater knowledge just because they were exposed for a greater period of time doesn't bear its own weight. In fact, if the plaintiffs have that burden, they have to establish that there is a genuine issue of material fact. And that's what Judge Peterson found that was not done here. With respect to the deliberate encounter exception, not only was that not raised at the trial level, but nor were those words used, nor was any case cited in support of the deliberate encounter exception. And the Morrissey case, which the appellants rely upon here, also doesn't involve the conduct of an animal. It does involve an animal, but it doesn't involve the conduct of an animal. It was a horse that fell, and the issue was some accumulated soap that was near the track, and was the plaintiff aware of it, and were the defendants aware of it? So Morrissey does not address the deliberate encounter exception in connection with the conduct of an animal. I might also mention, I know it was mentioned in our brief, that assumption of the risk does apply particularly in the context of a contract for hire, which was involved here. It was an oral contract. It was informal, but they did have an agreement, the defendants and the plaintiff, that he would care for the animal. And he, by his own admission, was aware of the tendencies of the animal. The fourth basis that we asserted could be a basis for affirmance here is provocation. There was testimony from Ms. Axelrod Snow, who was the prior owner of Boe, that in the context that was described by the plaintiff, that that conduct, which is judged solely from the perspective of the animal itself, would have been provocative to the llama. And she's a llama trainer. She trained Boe. She also testified that he was gelded and so did not develop hormones and would not have been inherently aggressive. She was not aware of any aggressive tendencies. But her testimony does support potential affirmance on the ground. So she's giving testimony as a llama subjective evidence expert? I think she can give testimony. No, I don't think she can give testimony because she obviously doesn't know what was running through the llama's head at the time. But she can give testimony regarding her knowledge of llamas and of Boe and what miter could provoke them. I don't have any other comments unless there are other questions. Other questions? Thank you, Mr. Hunt. Thank you. Mr. Piles, rebuttal. The defendants have made the assertion that the only knowledge of any Now, in the record, it indicates the defendants had the knowledge of, one, that the llamas were aggressive. Two, that their llama, Boe, had spit out of anchor. That's in the record at C-158 and 159. That their llama had wrestled with other animals, interacted in an aggressive manner with other animals. That's in the record at 159. And four, that the llama had reared up its legs to another horse, essentially attacking another horse. That's in the record at 169. So the assertion that the only evidence, considering the aggressiveness of the llama was given by the plaintiff, is not true and inaccurate. Well, part of your argument, it seems like, and maybe the strongest part of it is the relative difference in knowledge and experience between the defendant and the plaintiff. But you said the plaintiff is 22 years old. At some point, it would be fair to say that somebody who is 62, like me, appreciates the danger of drowning, if I couldn't swim in a body of water, more than a 5-year-old, right? But yet a 5-year-old who's at large, the law is clear that that 5-year-old is, if you're old enough to be walking around unsupervised, you're old enough to appreciate the dangers of drowning in water. I've been bit, stepped on, thrown off, and every other kind of thing. And I've got a 22-year-old son who hasn't had all those things happen, but he's old enough to appreciate the fact that these animals are animals and given the opportunity and the right circumstances, they'll hurt you and you've got to be careful around them. So, I mean, and even under the law with like the drowning thing, driving a car, you know, you say, well, if you're old enough, 16 years old, you know how the kids get when they get about 17? They're experts after driving for a year. My standard comment was, look, I've driven a car farther than reversed than you've driven one in forward. But, so I know a lot more about driving a car than him, but we don't say that that immaturity because he hasn't lived as long as other people, that he can't, that somehow puts him at a legal disadvantage and inability to appreciate the dangers associated with being around wild animals, you know, or animals, undomesticated animals. I think to a certain extent I agree with your general premise, but this is, I mean, with all due respect, I don't know how many cases I've had with animals that involve a llama. And, you know, if you want to go back to what the defendant was just talking about, we had to have an expert come in and talk about specifically the specific characteristics of a llama and what a llama should do and gelding and so forth. You know, again, those are, I understand what you're saying, but I think that this is a unique instance. I think everybody to a certain extent can appreciate the risk of when there is an animal, like a horse or a dog, and if you do certain things you might provoke a reaction and so forth. I think that most people understand that. But, you know, a llama, in looking at what's talked about in the expert, you know, my research would indicate it's kind of an unusual animal and it does have and exhibit unusual characteristics. So the question's got to be who's in the best position here to appreciate the risk? The defendants say the defendant has none. I don't know anything. But he's had the animal for seven years. He's cured him for 1,800 days apparently. That's an awful lot of time. Every day going out at the barn, cleaning out the stalls, interacting with the llama. Then we have Mr. Edwards who was there on four to six occasions, maybe for a few days at a time while they're on vacation. I think that there is a knowledge gap there. And even though the words, the magic words, delivered, encountered, may or may not have been talked about, Mr. Lombardi certainly knew the aspects of having somebody come in and take care of his animals. Measuring all the different facts and the testimony and the people that were involved in this incident, these are facts that need to be sorted out by a fact finder. And in viewing the facts in a light most favorable to the plaintiff, and that's the standard that the court here in reviewing this is, I can't see how a motion for summary judgment should have been granted in this case, given what the defendant's knowledge was and the circumstances of how this occurred. If you look at the facts and you view them in a light most favorable to the plaintiff, and we draw every inference in the favor of the plaintiff, this should not have been decided as a matter of law. There are genuine issues of fact of what the relative risks of Mr. Lombardi and Mr. Edwards were and what happened. But the legal question isn't the relative knowledge of the two. It's whether your client had knowledge that this animal could hurt him. I think you're correct. And the defendant's knowledge in that regard, whether he had more or less, those are the issues. Did your client have knowledge that this animal could hurt him? I think more specifically, did he appreciate the risk, the real risk of what happened here? I don't think that he did. Well, not the nature of the injury, but that he could be injured. He didn't have to know that he could get a broken leg or a broken arm or a split lip. Right, I understand. But the fact that he would chase him and continue an attack, I mean, I think that's a little bit different. And again, Well, if he chased him for three hours and never hurt him, you wouldn't have a lawsuit. So the length of the chase is, what's that got to do with anything? I guess that's true. But it's also different from what he encountered previously. And when you talk about, well, Mr. Edwards knew about what the llama did or what he was exposed to, that was something that did not happen in Mr. Edwards' report. And frankly, the cases are very clear that when you're making that look at the assumption of the risk and did he really truly appreciate the danger, again, that is an issue that is typically and normally reserved for the jury. Absolutely. Thank you. Any other questions? Thank you. We'd like to thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.